## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

Concord Hospital, Inc.

     v.

NH Department of Health and Human
Services, et al.

Civil No. 23-cv-486-LM
Opinion No. 2024 DNH 063 P

## O R D E R

Plaintiff Concord Hospital, Inc. brings this action for declaratory and injunctive relief against the Commissioner of the New Hampshire Department of Health and Human Services ("the Commissioner") and several federal defendants.[1] With respect to the Commissioner, plaintiff—a provider of services to Medicaid patients—contends that the Commissioner violated certain provisions of the Medicaid Act and plaintiff's due process rights in seeking to: (1) recoup from plaintiff more than $8 million in "disproportionate share hospital" payments ("DSH payments"); and (2) allocate the discharged Medicaid debts of two bankrupt hospitals to plaintiff. With respect to the Federal Defendants, Plaintiff alleges that they improperly approved New Hampshire's Medicaid state plan for fiscal years 2011 through 2017 in violation of the Administrative Procedure Act ("APA").

---

[1] The federal defendants named in the complaint are the Secretary for the United States Department of Health and Human Services, the Administrator for the Centers for Medicare & Medicaid Services, and the Centers for Medicare & Medicaid Services. The court will refer to these three defendants, collectively, as "the Federal Defendants" throughout this order.

Presently before the court is the Commissioner's motion to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) (doc. no. 19) and plaintiff's motion for a preliminary injunction (doc. no. 2).[2] For the following reasons, the court grants in part and denies in part the Commissioner's motion to dismiss, and grants the motion for a preliminary injunction.

## STANDARDS OF REVIEW

I.   <u>The Commissioner's Motion to Dismiss</u>

A defendant may challenge the court's subject-matter jurisdiction under Rule 12(b)(1) in one of two ways. Freeman v. City of Keene, 561 F. Supp. 3d 22, 25 (D.N.H. 2021). First, the defendant may challenge the sufficiency of the allegations relied upon in the complaint to support jurisdiction. Id. Alternatively, the defendant can challenge the accuracy of the complaint's jurisdictional allegations. Id. The court's standard of review differs depending on the challenge brought. Id. Where a defendant challenges the sufficiency of the complaint's jurisdictional facts, the standard of review is the same as the Rule 12(b)(6) standard. Id. Where a defendant challenges the accuracy of the plaintiff's allegations, those allegations "are entitled to no presumptive weight," and "the court must address the merits of the jurisdictional claim by resolving the factual disputes between the parties." Valentin v. Hosp. Bella Vista, 254 F.3d 358, 363 (1st Cir. 2001).

---

[2] The court will address the Federal Defendants' motion to dismiss the APA claim (doc. no. 44) in a separate order.

Here, the Commissioner challenges only the sufficiency of the facts alleged in the complaint that would support the existence of jurisdiction. Therefore, the court applies the familiar 12(b)(6) standard to all of the Commissioner's arguments for dismissal.

Under Rule 12(b)(6), the court must accept the factual allegations in the complaint as true, construe reasonable inferences in the plaintiff's favor, and "determine whether the factual allegations in the plaintiff's complaint set forth a plausible claim upon which relief may be granted." Foley v. Wells Fargo Bank, N.A., 772 F.3d 63, 68, 71 (1st Cir. 2014) (quotation omitted). In addition to the complaint's well-pled factual allegations, the court may consider exhibits submitted with the complaint or sufficiently referred to in the complaint, official public records, documents central to the plaintiff's claim, and documents the authenticity of which is not disputed. See Newman v. Lehman Bros. Holdings, Inc., 901 F.3d 19, 25 (1st Cir. 2018). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). Analyzing plausibility is "a context-specific task" in which the court relies on its "judicial experience and common sense." Id. at 679.

II.   Plaintiff's Motion for a Preliminary Injunction

"A preliminary injunction is an extraordinary remedy never awarded as of right." Winter v. Nat. Res. Def. Council, 555 U.S. 7, 24 (2008). To obtain a preliminary injunction, the moving party must show: (1) a likelihood of success on

the merits; (2) that it is likely to suffer irreparable harm in the absence of a preliminary injunction; (3) that the balance of equities weighs in the movant's favor; and (4) that the injunction would serve the public interest. Arborjet, Inc. v. Rainbow Treecare Sci. Advancements, Inc., 794 F.3d 168, 171 (1st Cir. 2015). Irreparable harm and a sufficient likelihood of success on the merits are the most important factors. Thomas v. Warden, Fed. Corr. Inst., Berlin, N.H., 596 F. Supp. 3d 331, 336 (D.N.H. 2022). These two factors are reviewed on a "sliding scale," such that a strong showing on one prong can make up for a somewhat weaker showing on the other. Vaquería Tres Monjitas, Inc. v. Irizarry, 587 F.3d 464, 485 (1st Cir. 2009); accord Bos. Taxi Owners Ass'n, Inc. v. City of Boston, 180 F. Supp. 3d 108, 127 (D. Mass. 2016) (explaining that courts "sometimes award[ ] relief based on a lower likelihood of success on the merits when the potential for irreparable harm is high"); see, e.g., Pub. Serv. Co. of N.H. v. Patch, 167 F.3d 15, 26-27 (1st Cir. 1998) (affirming preliminary injunction where "one or more of the claims put forth . . . provide[d] fair grounds for further litigation—this lesser standard being defensible in light of the rather powerful showing of irreparable injury").

## BACKGROUND

I.     The Medicaid Act: Statutory and Regulatory Background

Medicaid is a cooperative federal-state program designed to provide medical services to individuals who, because they lack financial resources, cannot otherwise obtain medical care. N.H. Hosp. Ass'n v. Burwell, Civ. No. 15-cv-460-LM, 2016 WL 1048023, at *1 (D.N.H. Mar. 11, 2016) [hereinafter "N.H. Hosp. Ass'n I"]. The

Medicaid Act, 42 U.S.C. § 1396 et seq., "provides financial support to states that establish and administer state Medicaid programs in accordance with federal law." Long Term Care Pharm. All. v. Ferguson, 362 F.3d 50, 51 (1st Cir. 2004).

If a state elects to participate in Medicaid, it must comply with the requirements of the Medicaid Act, Harris v. McRae, 448 U.S. 297, 301 (1980), including the requirement that the state adopt a Medicaid "plan," 42 U.S.C. § 1396a(a). "The state plan is required to establish, among other things, a scheme for reimbursing health care providers for the medical services provided to needy individuals." Wilder v. Va. Hosp. Ass'n, 496 U.S. 498, 502 (1990). The state plan must be submitted to the Centers for Medicare & Medicaid Services ("CMS") for approval. N.H. Hosp. Ass'n v. Burwell, Civ. No. 15-cv-460-LM, 2017 WL 822094, at *1 (D.N.H. Mar. 2, 2017) [hereinafter "N.H. Hosp. Ass'n II"]. If CMS determines that the state plan complies with the Medicaid Act, CMS "shall approve" the plan. 42 U.S.C. § 1396a(b). Once the state plan is approved, the federal government provides reimbursements to the state for a portion of the expenditures that it incurs for Medicaid benefits, and for the necessary and proper costs of administering the state plan. N.H. Hosp. Ass'n I, 2016 WL 1048023, at *1. The state then reimburses the medical facilities for the care they provide to Medicaid patients. N.H. Hosp. Ass'n v. Azar, 887 F.3d 62, 66-67 (1st Cir. 2018) [hereinafter "N.H. Hosp. Ass'n III"]. States must also amend their state plans "whenever necessary to reflect . . . [m]aterial changes in State law, organization, or policy, or in the State's operation of the Medicaid program." 42 C.F.R. § 430.12(c)(1). Such an amendment is known as

a "State Plan Amendment" ("SPA"). SPAs, like the state plans themselves, must be submitted to CMS for approval, id. § 430.12(c)(2), and CMS must approve SPAs if they comply with the Medicaid Act, 42 U.S.C. § 1396a(b).

II.    DSH Payment Overview

In addition to reimbursements for the cost of care to eligible patients, the Medicaid Act provides for additional payments to "hospitals which serve a disproportionate number of low-income patients with special needs." 42 U.S.C. § 1396a(a)(13)(A)(iv); see N.H. Hosp. Ass'n III, 887 F.3d at 67 (citing 42 U.S.C. § 1396r-4(c)). States must ensure that hospitals serving a disproportionate share of such patients receive "an appropriate increase in the rate or amount of payment for such services" and that the reimbursements "reflect not only the cost of caring for Medicaid recipients, but also the cost of charity care given to uninsured patients." La. Dep't of Health & Hosps. v. Ctr. for Medicare & Medicaid Servs., 346 F.3d 571, 573 (5th Cir. 2003) (quotation omitted). These payments are known as DSH payments.

Under the Medicaid Act, each state participating in Medicaid is allocated a lump sum from which it will make DSH payments to qualifying hospitals. See 42 U.S.C. § 1396r-4(f). The state plan must define which hospitals are eligible to receive DSH payments and how eligible hospitals will receive DSH payments. See 42 U.S.C. § 1396r-4(a)(1)(A)-(B). Although the Medicaid Act requires states to designate certain hospitals as DSH-payment-eligible, see 42 U.S.C. § 1396r-4(b), states generally have discretion in designating other hospitals as disproportionate

share hospitals, so long as they have a Medicaid utilization rate of at least one percent and employ at least two obstetricians with staff privileges who treat Medicaid patients, see 42 U.S.C. § 1396r-4(d). States also have considerable discretion in determining how DSH payments will be calculated and in prioritizing DSH payments among different disproportionate share hospitals. See 42 U.S.C. § 1396r-4(c) (outlining three broad DSH payment methodology models that states may employ); see also 73 Fed. Reg. 77,904, 77,911 (Dec. 19, 2008) (noting that "[s]tates have considerable flexibility in developing DSH payment methodologies").

Regardless of the methodology the state elects to include in its state plan for making DSH payments, that methodology must go through a notice-and-comment process. See 42 U.S.C. § 1396a(a)(13)(A) [hereinafter "Section (13)(A)"]. Section (13)(A) provides that state plans "must" provide "for a public process for determination of rates of payment under the plan for hospital services." Id. Under this public process:

> (i) proposed rates, the methodologies underlying the establishment of such rates, and justifications for the proposed rates are published,
>
> (ii) providers, beneficiaries and their representatives, and other concerned State residents are given a reasonable opportunity for review and comment on the proposed rates, methodologies, and justifications,
>
> (iii) final rates, the methodologies underlying the establishment of such rates, and justifications for such final rates are published, and
>
> (iv) in the case of hospitals, such rates take into account (in a manner consistent with [42 U.S.C. § 1396r-4]) the

> situation of hospitals which serve a disproportionate number of low-income patients with special needs . . . .

Id. Section 1396r-4(a)(2)(D), referenced in subsection (iv) of Section (13)(A), provides in pertinent part:

> A State plan . . . shall not be considered to meet the requirements of [Section (13)(A)] . . . unless the State has submitted to the Secretary . . . a description of the methodology used by the State to identify and to make payments to disproportionate share hospitals . . . .

42 U.S.C. § 1396r-4(a)(2)(D) [hereinafter "Section (2)(D)"]. States must also provide notice "of any significant proposed change in its methods and standards for setting payment rates for services." 42 C.F.R. § 447.205(a). Other regulations set forth the manner in which such notice must be given. See 42 C.F.R. § 447.205(d).

In 1993, Congress amended the Medicaid Act to limit DSH payments in response to reports that some hospitals had received DSH payments in excess of "the net costs, and in some instances the total costs, of operating the facilities." N.H. Hosp. Ass'n III, 887 F.3d at 67 (quotation omitted). In response to these reports, Congress enacted legislation setting a hospital-specific upper limit on the amount of DSH funding an individual hospital may receive. See Omnibus Budget Reconciliation Act of 1993, Pub. L. No. 103-66, § 13621(b)(1), 107 Stat. 312 (codified at 42 U.S.C. § 1396r-4(g)). The relevant provision of the Medicaid Act provides that DSH payments to an individual hospital cannot exceed: (1) the costs incurred by that hospital for providing services to Medicaid patients, plus (2) the costs incurred by that hospital for providing services to patients without insurance or other source of third-party coverage, minus (3) Medicaid payments received by that hospital

(other than DSH payments) and minus (4) self-payments from uninsured patients. See 42 U.S.C. § 1396r-4(g)(1). This hospital-specific limit is known as the hospital's "uncompensated care costs." 42 U.S.C. § 1396r-4(j)(2).

To monitor DSH payments, Congress would later enact into law a requirement that each participating state provide the federal government with an annual report and audit on its DSH payment program. See Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub. L. No. 108-173, § 1001(d), 117 Stat. 2066 (codified at 42 U.S.C. § 1396r-4(j)). The audit must confirm, among other things, that "[o]nly the uncompensated care costs of providing inpatient hospital and outpatient hospital services to individuals described in [42 U.S.C. § 1396r-4(g)(1)(A)] are included in the calculation of the hospital-specific limits" for DSH payments. 42 U.S.C. § 1396r-4(j)(2)(C). Where an audit reveals that a hospital has received a DSH payment in excess of its uncompensated care costs (i.e., in excess of the hospital-specific cap on DSH payments set by the Medicaid Act), the state has one year to recoup the overpayment; otherwise, CMS may reduce the State's DSH funding in a subsequent year to offset the overpayment. See 42 U.S.C. § 1396b(d)(2)(C).

Implementing regulations pertaining to these auditing and reporting requirements provide that states must annually submit information "for each . . . hospital to which the State made a DSH payment." 42 C.F.R. § 447.299(c). One of the many pieces of information required by this regulation is each hospital's total annual uncompensated care costs, and the regulation establishes a formula to

determine whether given hospital-specific limits are being correctly calculated. See id. § 447.299(c)(16). Other regulations require the yearly audits to verify six specific items. See 42 C.F.R. § 455.304(d). The audit must verify that the state has documented and retained information and records regarding the cost of providing Medicaid-eligible services and services to the uninsured, as well as information and records regarding Medicaid payments and self-payments by the uninsured. 42 C.F.R. § 455.304(d)(5). The audit must also verify "the methodology for calculating each hospital's payment limit," including "how the State defines incurred . . . costs for furnishing . . . services to Medicaid individuals . . . and [uninsured] individuals." 42 C.F.R. § 455.304(d)(6).

III.   New Hampshire's Medicaid Plan

New Hampshire participates in Medicaid and had a state plan in place for each year relevant to the instant lawsuit (2011 through 2017). The methodology set forth in the state plan for distributing DSH payments underwent amendment via SPAs from year-to-year, but generally speaking, the methodology was as follows. For each year, the state plan provided that, if an in-state, non-public general hospital (1) had at least two obstetricians with staff privileges who had agreed to provide obstetrics services to Medicaid patients and (2) had a Medicaid utilization rate of at least one percent, then the hospital "shall receive" a DSH payment. E.g., doc. no. 1-2 at 11.[3] For 2011 through 2013, the state plan provided that "critical

---

[3] Accord doc. no. 1-3 at 9; doc. no. 1-4 at 5; doc. no. 1-5 at 5; doc. no. 1-6 at 4 (showing that page 5a of state plan was not amended); doc. no. 1-7 at 4 (same).

access hospitals" would receive a DSH payment equal to one hundred percent of their uncompensated care costs. See id.; doc. no. 1-3 at 9. Remaining DSH funds would be paid to "non-critical access hospitals" (of which plaintiff is one) on a uniform, pro rata basis of such hospitals' uncompensated care costs using whatever funds remained after making DSH payments to critical access hospitals. See doc. no. 1-2 at 11; doc. no. 1-3 at 9. Subsequent amendments to the state plan provided that, in years 2014 through 2017, critical access hospitals would receive a DSH payment equaling seventy-five percent of their uncompensated care costs, with the remainder paid to non-critical access hospitals using a pro rata methodology. See, e.g., doc. no. 1-4 at 5.

For each year in question, the state plan provided that disproportionate share hospitals would initially receive an interim DSH payment for that year based on projected uncompensated care costs. For each year, the state plan set forth that "[t]his payment amount is reconciled in a subsequent year to account for variances identified between projected uncompensated care costs and actual uncompensated care costs." E.g., doc. no. 1-2 at 11. Starting in 2014, the state plan clarified that this reconciliation would be based on hospitals' actual uncompensated care costs "as determined by the independent certified audit" required by the Medicaid Act and its regulations. E.g., doc. no. 1-4 at 5. And beginning in 2015, the state plan further clarified that the State "will use funds resulting from such . . . reconciliation . . . to pay appropriate DSH payment amounts to hospitals where such . . . reconciliation results show DSH underpayments." Doc. no. 1-5 at 7. Thus, the state plan

11

established a methodology by which a disproportionate share hospital could be required to remit some of its interim DSH payment where the federally required audit revealed that the hospital's actual uncompensated care costs were lower than its projected uncompensated care costs—even if the interim payment the hospital received was still less than its total uncompensated care costs (i.e., even where the interim payment did not exceed the hospital-specific limit set forth in the Medicaid Act).

The state plan did not define what hospital costs are included in the calculation of a hospital's uncompensated care costs. Rather, the state plan defined uncompensated care costs simply by referring to the definition set forth in the Medicaid Act: the cost of providing inpatient and outpatient hospital services to Medicaid patients and uninsured patients, minus other Medicaid payments received and self-payments. See, e.g., doc. no. 1-2 at 11.

IV.   Factual Background[4]

Plaintiff received interim DSH payments in 2011 and 2014 through 2017 based on its projected uncompensated care costs for those years. Plaintiff did not receive any DSH payments in 2012 or 2013. In 2015, an accounting firm completed the federally required audit for New Hampshire's 2011 DSH payments. The report summarizing the audit's findings calculated the uncompensated care costs for each hospital receiving a DSH payment in that year. Of the twenty-seven New

---

[4] The following facts are drawn from plaintiff's complaint and the exhibits attached thereto. They are not in dispute for purposes of plaintiff's preliminary injunction motion.

Hampshire hospitals receiving an interim DSH payment based on their projected uncompensated care costs, twelve received an interim payment that was ultimately in excess of their actual uncompensated care costs. In addition, the report stated that several hospitals receiving DSH payments were unable to provide certain documentation needed to accurately calculate those hospitals' actual uncompensated care costs.

In January 2016, the Commissioner sent plaintiff a letter explaining that the audit regarding 2011 DSH payments had been completed and that the audit had calculated hospitals' uncompensated care costs for that year. The letter explained that the Commissioner would recoup DSH payments that were in excess of hospitals' uncompensated care costs and redistribute them to other eligible hospitals. The letter also explained that the state plan "required that all DSH payments be reconciled and adjusted against the federally required audit findings"; as such, the Commissioner stated she was "required . . . to recalculate the amount of [DSH payment] owed to each hospital for [fiscal year] 2011 and recoup and redistribute." Doc. no. 1-12 at 2-3. The letter referred to New Hampshire's state plan which provided that, after making DSH payments to critical access hospitals at 100% of such hospitals' uncompensated care costs, remaining DSH funds would be paid to non-critical access hospitals (such as plaintiff) at a "lower, uniform percentage of their [uncompensated care costs]." Id. at 2.

Attached to the letter was a chart demonstrating the methodology by which the Commissioner determined whether each hospital receiving a DSH payment in

2011 needed to remit some of its interim payment. See id. at 5. The chart set forth that, after making payments to critical access hospitals, sufficient DSH funding remained to make pro rata DSH payments to non-critical access hospitals such that each non-critical access hospital would receive a DSH payment equal to 64.3% of the hospital's uncompensated care costs. The chart showed that, although plaintiff's interim DSH payment was not in excess of its uncompensated care costs as determined by the audit (i.e., was not greater than the hospital-specific limit set forth in the Medicaid Act), the Commissioner nonetheless needed to recoup a portion of plaintiff's interim DSH payment because plaintiff's actual uncompensated care costs turned out to be lower than its estimated uncompensated care costs. Because the state plan entitled plaintiff, as a non-critical access hospital, to a DSH payment equaling 64.3% of its uncompensated care costs, the fact that plaintiff's actual uncompensated care costs turned out to be lower than its projected costs meant that plaintiff had received an interim DSH payment that was greater than 64.3% of its uncompensated care costs. Therefore, the Commissioner planned to recoup a portion of plaintiff's interim DSH payment and redistribute it to other hospitals that the audit revealed to be underpaid.

The audit, however, had determined hospitals' uncompensated care costs in reliance on certain sub-regulatory guidance issued by CMS. The New Hampshire Hospital Association ("the Hospital Association"), of which plaintiff is a member, brought suit in this court challenging the validity of this guidance. See N.H. Hosp. Ass'n I, 2016 WL 1048023, at *1. This court issued a preliminary injunction

enjoining CMS from relying on this guidance and from recouping any federal DSH funds provided to New Hampshire based on the application of this guidance. See id. at *19. This court subsequently granted summary judgment to the Hospital Association, permanently enjoining CMS from applying this guidance until it was properly promulgated as a regulation. See N.H. Hosp. Ass'n II, 2017 WL 822094, at *16. The First Circuit later affirmed the summary judgment order. See N.H. Hosp. Ass'n III, 887 F.3d at 66.

Because of this litigation, the reconciliation process for 2011 DSH payments was delayed. The firm that had previously completed the audit of 2011 DSH payments would later issue an addendum to its audit recalculating hospitals' actual uncompensated care costs for 2011 without applying the enjoined guidance. The recalculations revealed once again that, although plaintiff's interim DSH payment was not in excess of its actual uncompensated care costs for 2011, plaintiff had nonetheless received an interim payment that was greater than the payment it was entitled to under the state plan's pro rata methodology. This same firm also completed audits for 2014 through 2017—the other years at issue in this case. The audits revealed that plaintiff had received a greater payment than it was entitled to under the state plan methodology for 2014, 2015, and 2016. However, the audits revealed that plaintiff's interim DSH payment for 2017 was lower than it was entitled to under the state plan methodology (i.e., that it was owed an additional payment for 2017).

Another obstacle to the Commissioner's implementation of the reconciliation process arose in 2020 when LRGHealthcare, which operated two hospitals in the Lakes Region of New Hampshire, filed for bankruptcy. See In re: HGRL, Case No. 20-10892-MAF (Bankr. D.N.H.). Audits had revealed that LRGHealthcare received DSH overpayments between 2011 and 2017. LRGHealthcare's debts became unrecoverable in 2021 when a joint plan for liquidation was confirmed. As a result, the Commissioner has been unable to recover the overpayments from LRGHealthcare and the total amount of DSH funding available for the reconciliation process for 2011 through 2017 has been reduced by the extent of the unrecoverable overpayments.

Because the methodology for DSH payments in New Hampshire's state plan for 2011 through 2017 based non-critical access hospitals' DSH payments on the total amount of DSH funds available, the inability to recover LRGHealthcare's overpaid DSH benefits would result in a reduction of each such hospital's final payment under the state plan. However, at the Hospital Association's request, the Commissioner decided to deviate from the state plan's methodology such that only hospitals that were underpaid in their interim DSH benefits in a given year would absorb the cost of the Commissioner's inability to recoup overpayments to LRGHealthcare for that year. In other words, instead of requiring all non-critical access hospitals to bear the cost of the reduction in overall DSH funding available, the Commissioner decided to account for the reduction in funding by requiring only hospitals which had been underpaid in DSH benefits in a given year to absorb the

cost of the funding shortfall in that year. Plaintiff, which had been underpaid in DSH benefits for 2017, stood to lose approximately $280,000 in DSH payments for that year as a result of this decision.

In August 2023, the Commissioner informed plaintiff that, after the uncertainties caused by the New Hampshire Hospital Association litigation and LRGHealthcare's bankruptcy, the Commissioner had finalized reconciliation calculations for 2011 through 2017. Then, in October 2023, the Commissioner sent plaintiff a letter stating that the Commissioner would seek to recoup overpayments in DSH benefits to plaintiff from 2011 through 2017. The letter states that plaintiff is required to remit approximately $8 million due to overpayments in those years.

Plaintiff thereafter instituted this action against the Commissioner and the Federal Defendants. Plaintiff brings five counts, four of which are brought against the Commissioner and one of which is brought against the Federal Defendants:

- In Count I (Medicaid Act claim), plaintiff asserts that the Commissioner violated certain provisions of the Medicaid Act (specifically, Sections (13)(A) and (2)(D), discussed above) by failing to include "a legally sufficient description of the methods used to calculate or audit uncompensated care costs" in the state plan. Doc. no. 1 ¶ 88. Plaintiff contends that Sections (13)(A) and (2)(D) require state plans "to provide a methodology for calculating uncompensated care costs." Id. ¶ 82. In addition, plaintiff contends that Sections (13)(A) and (2)(D) require this methodology for calculating uncompensated care costs to be "clear." Id. ¶ 93. Plaintiff's ultimate contention appears to be that, because the definition of uncompensated care costs in the state plan mirrors the definition set forth in the Medicaid Act and provides no greater specificity than does the Medicaid Act, the state plan violates Sections (13)(A) and (2)(D) of that same Act.

- In Count II (Medicaid Act claim), plaintiff contends that the Commissioner's plan to require hospitals that were underpaid in DSH benefits in a given year to absorb the reduction in overall funding occasioned by LRGHealthcare's bankruptcy violates Sections (13)(A) and (2)(D). Plaintiff argues that the Commissioner's plan "amounts to a substantive change" to the state plan which did not undergo the notice-and-comment procedures required by those sections. Doc. no. 1 ¶ 95.

- In Count III (procedural due process claim), plaintiff asserts that the Commissioner's plan to recoup DSH overpayments from plaintiff violates plaintiff's procedural due process rights. Plaintiff contends that it has "a protected property interest in having DSH payments calculated in accordance with the statutorily defined process." Doc. no. 1 ¶ 106. According to plaintiff, before the Commissioner may recoup any overpayments, the Commissioner must provide "adequate guidance for calculating uncompensated care costs through notice-and-comment rulemaking," among other things. Id. ¶ 113.

- In Count IV (procedural due process claim), plaintiff contends that the Commissioner's allocation to plaintiff of LRGHealthcare's DSH overpayments for 2017 violates procedural due process because it would deprive plaintiff of a DSH payment to which it is entitled without adequate process.

- In Count V (APA claim), plaintiff contends that the Federal Defendants violated the APA by approving the state plan in effect from 2011 through 2017 despite the fact that the plan does not meet the requirements of the Medicaid Act (i.e., despite the fact that it does not offer a more specific definition of uncompensated care costs than is set forth in the Medicaid Act).

Counts I through IV are brought under 42 U.S.C. § 1983. Count V is brought under the APA's cause of action, 5 U.S.C. § 704. Plaintiff seeks declaratory and injunctive relief.

18

Plaintiff filed a motion for a preliminary injunction along with its complaint. Plaintiff moves to preliminarily enjoin the Commissioner from recouping the alleged DSH overpayments and from allocating to plaintiff LRGHealthcare's discharged Medicaid debts. Plaintiff contends that, because sovereign immunity would bar plaintiff from recovering any payments remitted to or retained by the state, plaintiff would be irreparably harmed absent a preliminary injunction.

The Commissioner objects to the preliminary injunction motion and moves to dismiss Counts I through IV. The Commissioner raises numerous arguments disputing plaintiff's likelihood of success on the merits and in support of its motion to dismiss. The court will first consider the Commissioner's motion to dismiss. It will then consider plaintiff's motion for a preliminary injunction.

## DISCUSSION

I.      Sovereign Immunity Does Not Bar Plaintiff's Claims

The Commissioner contends that the doctrine of sovereign immunity embodied in the Eleventh Amendment bars all claims against it. The Eleventh Amendment provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. "The Supreme Court has held that the doctrine of sovereign immunity reaches beyond the words of the Eleventh Amendment, extending immunity to state governments in suits not only by citizens of another state, but by its own citizens as well." Irizarry, 587 F.3d at 477 (citing

Alden v. Maine, 527 U.S. 706 (1999)). "An administrative arm of the state is treated as the state itself for the purposes of the Eleventh Amendment, and it thus shares the same immunity." Id.

An exception to sovereign immunity, the Ex parte Young doctrine, "permits suits to proceed against state officers in their official capacities to compel them to comply with federal law." Id. at 477-78; see Ex parte Young, 209 U.S. 123 (1908). However, such suits "may only seek prospective injunctive or declaratory relief; they may not seek retroactive monetary damages or equitable restitution." Irizzary, 587 F.3d at 478. "[T]he difference between the type of relief barred by the Eleventh Amendment and that permitted under Ex parte Young will not in many instances be that between day and night." Edelman v. Jordan, 415 U.S. 651, 667 (1974). For example, an "ancillary effect" on the state's treasury as a "necessary result of compliance with" court orders which "by their terms [are] prospective in nature" does not run afoul of the Eleventh Amendment. Id. at 667-68. In some instances, a permissible ancillary effect on the public treasury due to compliance with prospective relief may be quite substantial. See, e.g., Milliken v. Bradley, 433 U.S. 267, 289-90, 293-94 (1977) (upholding district court order requiring school system to implement educational programs despite estimates that it would cost the state approximately $6 million to do so).

Here, the complaint names the Commissioner of the New Hampshire Department of Health and Human Services, in her official capacity, as the defendant for each of Counts I through IV. The complaint seeks relief declaring that

the Commissioner's recoupment and reallocation plans are unlawful and enjoining the Commissioner from recouping DSH payments from plaintiff and from allocating LRGHealthcare's discharged bankruptcy debts to plaintiff. However, the Commissioner contends that plaintiff's claims are barred by the Eleventh Amendment. According to the Commissioner, plaintiff seeks retroactive monetary relief because "[p]laintiff seeks to impose a monetary loss on the State as a remedy for an alleged past breach of a legal duty." Doc. no. 19-1 at 10. The Commissioner argues that the relief requested in the complaint is no different from an award of damages because it would permit plaintiff to retain funds that had only been awarded on an interim basis.

The Commissioner is incorrect. As the First Circuit has explained, "[o]nly if the state is forced to use funds from the state treasury to satisfy a compensatory judgment do the adverse consequences that the Eleventh Amendment prohibits occur." Libby v. Marshall, 833 F.2d 402, 406 (1st Cir. 1987). "That an equitable remedy results in the payment of monies to plaintiff does not, in itself, render the relief monetary compensation . . . ." Irizzary, 587 F.3d at 479-80. To determine whether Ex parte Young applies, "a court need only conduct a 'straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'" Verizon Md., Inc. v. Pub. Serv. Comm'n of Md., 535 U.S. 635, 645 (2002) (quoting Idaho v. Couer d'Alene Tribe of Idaho, 521 U.S. 261, 296 (1997) (O'Connor, J., concurring in part and concurring in the judgment)).

21

In this case, plaintiff seeks to preliminarily and permanently "enjoin [the Commissioner] from recouping the alleged DSH overpayments made to" plaintiff and to "enjoin [the Commissioner] from redistributing the bankrupt hospitals' debts to" plaintiff. Doc. no. 1 at 24. This is forward-looking, prospective relief. The complaint seeks to prevent the Commissioner from taking certain actions which plaintiff claims would violate the public process requirements of the Medicaid Act and plaintiff's due process rights. That the requested relief would result in plaintiff retaining funds previously disbursed does not convert the requested relief from prospective to retrospective in nature.

The Eleventh Circuit's opinion in Turner v. Ledbetter, 906 F.2d 606 (11th Cir. 1990), is instructive. There, the State of Georgia sought to recoup alleged overpayments made pursuant to the Aid to Families with Dependent Children ("AFDC") program, and the recipients of said payments brought suit to enjoin the state from doing so. 906 F.2d at 607-08. The state argued that enjoining the recoupment of overpayments would violate the Eleventh Amendment because such relief would have a direct impact on the state treasury and would be the functional equivalent of a damages award. Id. at 609. The Eleventh Circuit disagreed "because the recipients are not seeking damages, but rather are seeking to prevent the state from essentially accomplishing a . . . termination of AFDC benefits." Id. Because the requested relief "sought to prevent state officials from future violations of federal law" rather than a monetary award stemming from a past violation of federal law, the Eleventh Amendment posed no bar. Id.

District courts have applied Ledbetter to hold that the Eleventh Amendment does not prohibit injunctions against clawing back previously disbursed Medicaid benefits. See Ron Grp., LLC v. Azar, 574 F. Supp. 3d 1094, 1106-08 (M.D. Ala. 2021) (ruling that sovereign immunity did not prohibit injunction prohibiting recoupment of Medicaid reimbursements "in order to satisfy another Medicaid provider's debt"); Conn. Hosp. Ass'n v. O'Neill, 891 F. Supp. 693, 695 (D. Conn. 1995) (ruling that sovereign immunity did not prohibit injunction preventing state from offsetting future Medicaid payments in order to recoup prior overpayments). This court joins those courts in concluding that plaintiff's claims against the Commissioner, which seek only to prevent the Commissioner from taking actions that would allegedly violate federal law, do not run afoul of the Eleventh Amendment. See Verizon, 535 U.S. at 645.

## II.    Other Disproportionate Share Hospitals Are Not Necessary Parties

In the alternative to its sovereign immunity defense, the Commissioner argues that plaintiff's claims against her should be dismissed for failure to join other disproportionate share hospitals. Federal Rule of Civil Procedure 19 provides that certain persons are required to be joined as parties to civil actions when feasible. Fed. R. Civ. P. 19(a). The rule "is geared toward circumstances 'where a lawsuit is proceeding without a party whose interests are central to the suit.'" Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Flanders-Borden, 11 F.4th 12, 17 (1st Cir. 2021) (quoting Bacardi Int'l Ltd. v. V. Suárez & Co., 719 F.3d 1, 9 (1st Cir. 2013)). If a necessary party cannot be joined, the court must make a "pragmatic,

23

practical" judgment as to "whether the action should proceed among the existing parties or be dismissed." Id. (quoting Bacardi, 719 F.3d at 9). The Commissioner, as the moving party, bears the burden on this issue. Frangos v. Bank of N.Y. Mellon, Civ. No. 16-cv-436-LM, 2017 WL 4466583, at *3 (D.N.H. Oct. 5, 2017).

A person is a necessary party who must be joined if, "in that person's absence, the court cannot afford complete relief among existing parties." Fed. R. Civ. P. 19(a)(1)(A). In addition, a person is a necessary party if the person has "an interest relating to the subject of the action" and proceeding without that person may "impair or impede the person's ability to protect [their] interest" or "leave an existing party subject to a substantial risk of double, multiple, or otherwise inconsistent obligations." Fed. R. Civ. P. 19(a)(1)(B).

The Commissioner contends that other hospitals who were underpaid in DSH benefits between 2011 and 2017 are necessary parties because they have an interest in this action that would be impaired or impeded if the suit proceeded in their absence. The Commissioner points out that, if she is enjoined from recouping portions of plaintiff's interim DSH payments, the overall amount of DSH funding available to reallocate to underpaid hospitals will be reduced, such that underpaid hospitals would not receive the final DSH payments to which they are entitled under New Hampshire's state plan. Because such a result is contrary to those hospitals' interest, the Commissioner contends that those hospitals are necessary parties, and plaintiff's failure to join them compels dismissal.

24

The Commissioner has not shown that other disproportionate share hospitals are necessary parties. "[W]here the interests of an absent party are aligned closely enough with the interests of an existing party, and where the existing party pursues those interests in the course of the litigation, the absent party is not required under Rule 19." Merrill Lynch, 11 F.4th at 17; accord Bacardi, 719 F.3d at 10-12; Pujol v. Shearson Am. Express, Inc., 877 F.2d 132, 135 (1st Cir. 1989) (Breyer, J.). "The interests of the absent and existing parties need not be 'virtually identical.'" Merrill Lynch, 11 F.4th at 17 (quoting Bacardi, 719 F.3d at 11). Rather, where the absent parties' interests are "vigorously addressed" by a named party, joinder is not required. Nat'l Ass'n of Chain Drug Stores v. New Eng. Carpenters Health Benefits Fund, 582 F.3d 30, 43 (1st Cir. 2009).

Here, while it is apparent that hospitals that were underpaid in DSH benefits in the years in which plaintiff was overpaid have an interest in the recoupment of plaintiff's overpayments, that interest is aligned with the Commissioner's interest—clawing back plaintiff's overpayments and distributing them to these very same hospitals. Indeed, the Commissioner does not attempt to argue that the absent hospitals' interests diverge from the Commissioner's interests, or that the Commissioner's position in this litigation would inadequately address those hospitals' interests. As such, the Commissioner has not shown that other disproportionate share hospitals are necessary parties, and Rule 19 provides no basis for dismissal.

III.   Medicaid Act Claims

The Commissioner argues that neither of plaintiff's Medicaid Act claims—Counts I and II—state a plausible claim to relief. The court will first consider Count I, then turn to Count II.

A.   Count I Fails to State a Claim

Count I alleges that the Commissioner violated Sections (13)(A) and (2)(D) of the Medicaid Act by failing to include a "legally sufficient" and "clear" description of the state's methodology "to calculate or audit uncompensated care costs" in the state plan that was in effect from 2011 through 2017. Doc. no. 1 ¶¶ 88, 93. The problem with this claim, however, is that neither Section (13)(A) nor Section (2)(D) impose substantive requirements on the description of the methodology set forth in a state plan for calculating DSH payments (or, by extension, uncompensated care costs). These provisions impose procedural requirements which the state must follow in promulgating its DSH payment methodology, but they do not require any particular degree of specificity in the description of the state's methodology that is ultimately promulgated.

The court begins with the language of the statutes. Section (13)(A) sets forth that state plans "must" provide "for a public process for determination of rates of payment under the plan for hospital services." 42 U.S.C. § 1396a(a)(13)(A). Under this public process:

> (i) proposed rates, the methodologies underlying the establishment of such rates, and justifications for the proposed rates are published,

> (ii) providers, beneficiaries and their representatives, and
> other concerned State residents are given a reasonable
> opportunity for review and comment on the proposed rates,
> methodologies, and justifications,
>
> (iii) final rates, the methodologies underlying the
> establishment of such rates, and justifications for such
> final rates are published, and
>
> (iv) in the case of hospitals, such rates take into account (in
> a manner consistent with [42 U.S.C. § 1396r-4]) the
> situation of hospitals which serve a disproportionate
> number of low-income patients with special needs . . . .

Id. Section (2)(D) in turn provides in pertinent part:

> A State plan . . . shall not be considered to meet the
> requirements of [Section (13)(A)] . . . unless the State has
> submitted to the Secretary . . . a description of the
> methodology used by the State to identify and to make
> payments to disproportionate share hospitals . . . .

42 U.S.C. § 1396r-4(a)(2)(D).

With respect to Section (13)(A), the First Circuit has explained that Section
(13)(A) "requires something on the order of notice and comment rulemaking for
states in their setting of rates for reimbursement." Long Term Care, 362 F.3d at 54.
Section (13)(A) requires state plans to provide "for a public process for
determination of rates of payment under the plan." 42 U.S.C. § 1396a(a)(13)(A).
Under this process, the state must publish "proposed rates, the methodologies
underlying the establishment of such rates, and justifications for the proposed
rates." Id. § 1396a(a)(13)(A)(i). Stakeholders and citizens must be "given a
reasonable opportunity for review and comment on the proposed rates,
methodologies, and justifications." Id. § 1396a(a)(13)(A)(ii). Moreover, the state
must publish its "final rates, the methodologies underlying the establishment of

such rates, and justifications for such final rates." Id. § 1396a(a)(13)(A)(iii).
Payment rates which undergo this notice-and-comment process must "take into
account (in a manner consistent with [Section (2)(D)]) the situation of"
disproportionate share hospitals. Id. § 1396a(a)(13)(A)(iv).

Nothing in Section (13)(A) imposes substantive requirements on the
description of the DSH payment methodology that is ultimately included in the
state plan. To be sure, the statute requires that states have a DSH payment
methodology and that this methodology be promulgated pursuant to a public
process. But at the conclusion of this process, the statute does not require that a
state's DSH payment methodology provide a particular level of granularity in
explaining the manner in which the state will calculate and distribute DSH
payments. In this case, plaintiff seeks to use Section (13)(A) to do just that. Despite
the fact that the state plan defines uncompensated care costs in a manner that is
identical to the Medicaid Act, plaintiff contends that Section (13)(A) requires the
state plan to provide greater specificity in how the state will go about calculating
hospitals' uncompensated care costs. The plain language of Section (13)(A) imposes
no such requirement. Because the plain language of the statute makes clear that it
imposes only procedural, non-substantive requirements on a state's DSH payment
methodology, plaintiff's claim—that the relevant versions of the state plan violate
Section (13)(A) by failing to contain a "legally sufficient" or "clear" description of
uncompensated care costs—fails as a matter of law.

Plaintiff contends, however, that Section (13)(A) must be read in conjunction with Section (2)(D). On this score plaintiff is correct, see § 1396a(a)(13)(A)(iv) (providing that payment rates must be "consistent with [Section (2)(D)]"), but Section (2)(D) does not save Count I. Section (2)(D) provides that a state plan "shall not be considered to meet the requirements of" Section (13)(A) "unless the State has submitted to the Secretary . . . a description of the methodology used by the State to identify and to make payments to disproportionate share hospitals." 42 U.S.C. § 1396r-4(a)(2)(D). But, as with Section (13)(A), the plain language of Section (2)(D) does not impose any substantive requirements on the description of a state's DSH payment methodology in the state plan. It merely requires the state to inform the federal government of whatever payment methodology the state elects to use.

Resisting Section (2)(D)'s unambiguous text, plaintiff contends that the statute does, in fact, impose substantive requirements on a state's methodology for making DSH payments. According to plaintiff, Section (2)(D) requires the state plan submitted to the Secretary to contain "a description of the methodology used by the State to identify . . . [DSH] payments." Doc. no. 34 at 32 (plaintiff's objection) (emphasis and alterations in objection) (quoting Section (2)(D)). This, however, is a selective, partial quotation of Section (2)(D). The statute actually provides that the state must provide the Secretary with "a description of the methodology used by the state to identify and to make payments to disproportionate share hospitals." 42 U.S.C. § 1396r-4(a)(2)(D) (emphasis added). Plaintiff would construe the statute such that the verbs "to identify" and "to make" both modify the subsequent phrase

"payments to disproportionate share hospitals," meaning that the statute would impose an obligation that the state plan "identify" DSH payments.

As an initial matter, it is not at all clear that such a construction would achieve the result plaintiff seeks. Plaintiff does not explain why a requirement that a state plan "identify" DSH payments meaningfully differs from a requirement that the state plan identify its DSH payment methodology. In either case, such a requirement would merely seem to entail that the state plan describe how it goes about making DSH payments. In any event, the court does not agree with plaintiff's construction of the statute.

Section (2)(D) seemingly can be read in one of two ways. It can be read in the manner plaintiff urges, such that its two antecedent verbal phrases are "to identify" and "to make," each of which modify the consequent phrase "payments to disproportionate share hospitals." Alternatively, Section (2)(D) can be read such that its two antecedent verbal phrases are "to identify" and "to make payments to," with each modifying the consequent phrase "disproportionate share hospitals." When "antecedents and consequents are unclear," courts determine the contours of a statute's antecedent and consequent phrases "by reference to the context and purpose of the statute as a whole." Go-Video, Inc. v. Akai Elec. Co., Ltd., 885 F.2d 1406, 1412 (9th Cir. 1989); accord 2A Norman Singer & Shambie Singer, Sutherland Statutes & Statutory Construction § 47:26 (7th ed.) ("Where a sentence contains several antecedents and several consequents, courts read them

distributively and apply the words to the subjects which, by context, they seem most properly to relate.").

Section (2)(D) appears in a provision of the Medicaid Act addressing DSH payments. See 42 U.S.C. § 1396r-4 (entitled "Adjustment in payment for inpatient hospital services furnished by disproportionate share hospitals"). The provision requires state plans to "specifically define[ ]" the hospitals within a state that are eligible to receive DSH payments. Id. § 1396r-4(a)(1)(A). Indeed, as previously noted, the statute gives states fairly broad discretion in determining which hospitals qualify as disproportionate share hospitals and are therefore eligible to receive DSH payments. See id. § 1396r-4(b) & (d)(1), (3).

In addition to conferring broad discretion on states to determine hospitals eligible for DSH payments (and requiring states to make such a determination), the statute in which Section (2)(D) appears requires state plans to "provide[ ] . . . for an appropriate increase in the rate or amount of payment" for disproportionate share hospitals. Id. § 1396r-4(a)(1)(B). In other words, the statute requires state plans to provide for DSH payments. As with determining hospitals eligible to receive DSH payments, the statute gives states substantial leeway in fashioning their methodology for making DSH payments. See id. § 1396r-4(c) (outlining three broad models upon which states may base their DSH payment methodology).

Thus, the statutory provision in which Section (2)(D) appears confirms that state plans must "specifically define[ ]" the hospitals which can receive DSH payments, in addition to requiring that state plans "provide[ ]" for DSH payments.

Id. § 1396r-4(a)(1)(A)-(B). At the same time, states have considerable discretion in defining disproportionate share hospitals and in designing their DSH payment system. Given this statutory framework, the most natural reading of Section (2)(D) is as requiring states to provide the federal government with a description of how the state "identif[ies] . . . disproportionate share hospitals," (i.e., how the state "specifically defines" such hospitals, id. § 1396r-4(a)(1)) as well as a description of how the state "make[s] payments to disproportionate share hospitals." Id. § 1396r-4(a)(2)(D). Plaintiff's alternate construction—that Section (2)(D) requires the state to describe how it "identifies [DSH] payments," but not how it identifies disproportionate share hospitals—is not only inconsistent with the statute's context and purpose, it would eliminate a requirement that the state inform the federal government of which hospitals it has defined as disproportionate share hospitals. That would be an odd result, especially given the Medicaid Act's general concern with ensuring federal oversight of state plans through mechanisms such as independent audits, preapproval of state plans and amendments thereto, and reporting requirements.

What is more, plaintiff's construction is an awkward fit with the plain meaning of Section (2)(D)'s text. The ordinary meaning of "identify" is "to establish the identity of." Identify, Webster's Third New Int'l Dictionary, at 1123 (1993). Similarly, "identity" means "sameness of essential or generic character in different examples or instances," or "the condition of being the same with something." Identity, Webster's Third New Int'l Dictionary, at 1123. These definitions fit snugly

with a construction of Section (2)(D) as requiring states to describe how they identify disproportionate share hospitals—as such hospitals must share common characteristics established by the state. It hardly bears repeating that a construction which comports with the statute's plain language is favored over one which does not. E.g., United States v. Letter from Alexander Hamilton to the Marquis De Lafayette Dated July 21, 1780, 15 F.4th 515, 524-25 (1st Cir. 2021).

Plaintiff contends that the Medicaid Act's implementing regulations support its interpretation of Sections (13)(A) and (2)(D) as requiring a state plan to define "uncompensated care costs" with greater specificity than that phrase is defined in the Medicaid Act itself. Plaintiff points to 42 C.F.R. §§ 447.205 and 455.304(d). Section 447.205 requires the state agency overseeing the state plan to "provide public notice of any significant proposed change in its methods and standards for setting payment rates for services." 42 C.F.R. § 447.205(a). However, the fact that the state must disclose any material alterations in its payment methods and standards does not show that the Medicaid Act itself imposes substantive obligations on the state. The state has discretion in setting its payment methods and standards—it just has to notify the public as to how it exercises that discretion.

Section 455.304(d) does not advance the plaintiff's position either. That regulation pertains to findings that the annual audits of a state's DSH payment program must render. DSH payment audits are an "enforcement mechanism" by which the federal government ensures that disproportionate share hospitals are not receiving payments in excess of their uncompensated care costs. N.H. Hosp. Ass'n

III, 887 F.3d at 67-68. Nothing in the Medicaid Act suggests that the requirements imposed upon the annual audits are wholesale applied to the state plan.

For these reasons, the court does not construe Sections (13)(A) or (2)(D) as imposing substantive requirements on states' methodologies for making DSH payments. Given this construction, Count I—which alleges that the relevant versions of the state plan fail to contain a "legally sufficient" or "clear" definition of how the state defines uncompensated care costs—fails to state a claim upon which relief may be granted.

B.   <u>Count II States a Claim Because Plaintiff Plausibly Alleges That the Commissioner Amended the State Plan without Complying with the Medicaid Act's Public Process Requirements</u>

The court reaches a different conclusion with respect to Count II. As previously noted, Count II alleges that the Commissioner's planned allocation to plaintiff of LRGHealthcare's DSH overpayment for 2017 violates Sections (13)(A) and (2)(D) because there is no mechanism set forth in the state plan which would allow for such an allocation to occur. Plaintiff contends that the relevant versions of the state plan are silent with respect to the handling of DSH overpayments to hospitals which subsequently go bankrupt.

The parties seem to agree that LRGHealthcare's bankruptcy reduced the overall amount of funding available for the reconciliation of final DSH payments in each of 2011 through 2017 by the extent to which LRGHealthcare was overpaid in each of those years. While previous versions of the state plan provide that a noncritical access hospital's DSH payment is contingent on the availability of

34

funding, it does not appear that the state plan for 2017 contained such a contingency. Rather, that version of the state plan seems to state that, for 2017, each noncritical access hospital "shall be paid 50% of its uncompensated care costs," with certain exceptions not here relevant. E.g., doc. no. 1-7 at 5. While the Commissioner argues that the state plan contemplated that a reduction in overall funding could correspondingly reduce a hospital's DSH payment, the 2017 state plan provisions (or at least those that the parties have provided to the court) do not seem to contemplate this possibility.

Regardless, even if the state plan provided that a reduction in overall DSH funding could reduce non-critical access hospitals' DSH payments, the state plan nevertheless states that non-critical access hospitals are entitled to receive a 2017 DSH payment that is proportional to their uncompensated care costs for that year. While a reduction in overall DSH funding could reduce the reimbursement percentage of those hospitals' uncompensated care costs (say, by reducing reimbursement from 50% of uncompensated care costs to 45%), the state plan contemplates that non-critical access hospitals will receive DSH payments on a pro rata basis. In other words, the state plan contemplates that the reimbursement percentage for all noncritical access hospitals will be equivalent.

The Commissioner's plan to account for LRGHealthcare's bankruptcy deviates from pro rata DSH payments. Instead of reducing each non-critical access hospital's DSH payment by a uniform percentage, the Commissioner has elected to only reduce DSH payments for hospitals that received an interim payment that was

lower than the audits revealed them to be entitled to. While Section (13)(A) does not impose substantive requirements on states' DSH payment methodologies, it does require that whatever DSH payment methodology the state elects undergo notice and comment. Moreover, any changes to a state's DSH payment methodology must undergo this same process. See 42 C.F.R. § 447.205(a). Plaintiff alleges that the Commissioner has substantially altered the state's DSH payment methodology without complying with Section (13)(A)'s public process requirement. These allegations state a claim for violation of the Medicaid Act.

The Commissioner nevertheless seeks dismissal of Count II on standing grounds,[5] and pursuant to the statute of limitations and the doctrine of laches.[6] In addition, the Commissioner contends that there is no private right of action under which plaintiff can bring Count II. The court will consider each of these arguments in turn.

---

[5] The Commissioner purports to challenge plaintiff's standing as to Count II under Rule 12(b)(6). But standing is an issue of the court's jurisdiction, and is therefore subject to review under Rule 12(b)(1), not 12(b)(6). See Freeman, 561 F. Supp. 3d at 25-26. Because the Commissioner does not challenge the accuracy of the facts relied upon in the complaint to support standing, however, the standard of review is the same regardless of whether the court applies 12(b)(6) or 12(b)(1). See id.

[6] The Commissioner argued in her original motion to dismiss that all of the claims against her should be dismissed as untimely and pursuant to the doctrine of laches. However, in her reply, the Commissioner appears to abandon the argument that Count II should be dismissed pursuant to the statute of limitations or laches. See doc. no. 38 at 4 (arguing only that "Counts I and III are barred by the statute of limitations and laches"). The court need not determine whether Count I is timely or barred by laches given its conclusion that Count I fails to state a claim. However, for the sake of completeness, the court will address the statute of limitations and laches with respect to Count II despite the Commissioner's possible intent to abandon those arguments as to Count II.

1.   Plaintiff Has Adequately Alleged Standing

The doctrine of standing emanates from Article III's case-or-controversy requirement. Freeman, 561 F. Supp. 3d at 30. For a plaintiff to have standing, the plaintiff must have suffered a "concrete" injury. TransUnion LLC v. Ramirez, 594 U.S. 413, 424 (2021). The Commissioner argues that Count II should be dismissed because plaintiff has not plausibly alleged that it has suffered or will suffer a concrete injury as a result of the Commissioner's decision to allocate LRGHealthcare's overpayments in each year exclusively to hospitals that were underpaid in DSH benefits in those years, rather than requiring all hospitals to evenly bear the reduction in overall DSH funding resulting from LRGHealthcare's bankruptcy. The Commissioner claims that, although plaintiff alleges that it will be deprived of its final DSH payment for 2017—approximately $281,000—as a result of the methodology change, this is insufficient to show an injury for standing purposes because plaintiff, having been overpaid in DSH benefits for 2011, 2014, 2015, and 2016, has a lesser repayment obligation for those years as a result of the methodology change. In other words, the Commissioner contends, "[p]laintiff alleges no facts demonstrating that the reduction to its final DSH payment adjustment for 2017 exceeds the sum of any increase to its final DSH payment adjustments for 2011, 2014, 2015, and 2016 resulting from the methodology change." Doc. no. 19-1 at 33.

The court finds that plaintiff has sufficiently alleged standing at the pleading stage. Plaintiff alleges a substantial financial injury as a result of the Commissioner's decision to allocate LRGHealthcare's discharged bankruptcy debts

to underpaid disproportionate share hospitals. "[M]onetary harms" are among "[t]he most obvious" types of injuries giving rise to standing. TransUnion, 594 U.S. at 425; see also 13A Edward H. Cooper, Federal Practice & Procedure § 3531.4 (3d ed.) (stating that "[s]tanding is found readily . . . when injury to some traditional form of property is asserted"). Despite the Commissioner's argument to the contrary, plaintiff's complaint need not affirmatively allege that it would not have suffered financial harm (or at least would have suffered a lesser financial harm) had the Commissioner simply reduced all hospital's final DSH payments for each year instead of only reducing underpaid hospitals' payments. See Peters v. Aetna, Inc., 2 F.4th 199, 218-19 (4th Cir. 2021) (holding that ERISA claimant had standing to seek restitution for alleged overpayments for a particular service under a challenged health insurance scheme even if, considering all of plaintiff's claims under the plan in the aggregate, she benefitted from the challenged scheme). "The fact that an injury may be outweighed by other benefits does not negate standing." New York v. U.S. Dep't of Homeland Sec., 969 F.3d 42, 60 (2d Cir. 2020) (brackets and ellipses omitted) (quoting Denney v. Deutsche Bank AG, 443 F.3d 253, 265 (2d Cir. 2006)). "Once injury is shown, no attempt is made to ask whether the injury is outweighed by benefits the plaintiff has enjoyed from the relationship with the defendant." Cooper, supra, § 3531.4; see also Peters, 2 F.4th at 218 n.10 (collecting cases). For these reasons, the court rejects the Commissioner's standing challenge to Count II.

 2.   Count II Is Timely

Count II is brought under 42 U.S.C. § 1983. In § 1983 actions, "the relevant limitations period is that which governs personal injury claims in the state where the claim arose." Gorelik v. Costin, 605 F.3d 118, 121 (1st Cir. 2010). New Hampshire's limitations period for personal injury actions is three years. RSA 508:4. "It is federal law, however, that determines when the statute of limitations begins to run." Gorelik, 605 F.3d at 121.

"As a general matter, the statute of limitations begins to run when the plaintiff has a 'complete and present cause of action.'" Reed v. Goertz, 598 U.S. 230, 235 (2023) (quoting Bay Area Laundry & Dry Cleaning Pension Tr. Fund v. Ferbar Corp. of Cal., 522 U.S. 192, 201 (1997)). This requires consideration of the "specific . . . right alleged to have been infringed." Id. The plaintiff has a complete and present cause of action "when all of the acts comprising the specific constitutional [or statutory] violation have been completed." Oullette v. Beaupre, 977 F.3d 127, 136 (1st Cir. 2020); see also 3 Sheldon H. Nahmod, Civil Rights & Civil Liberties Litigation: The Law of Section 1983 § 9:10 (Sept. 2023 update) (explaining that accrual presents "the question of when all the elements of a § 1983 cause of action are present").

The complaint alleges that LRGHealthcare went bankrupt in 2021 and that the Commissioner elected to allocate LRGHealthcare's overpayments to underpaid hospitals sometime between 2021 and August 11, 2023. As Count II is premised on that alleged decision, plaintiff did not have a complete and present cause of action

until 2021 at the earliest. Plaintiff filed this action in October 2023, within three years of 2021. As such, Count II is timely.

    3.   The Doctrine of Laches Does Not Bar Count II

The Commissioner argues that Count II should be dismissed pursuant to the doctrine of laches. "In general terms, the doctrine of laches restricts the assertion of claims or defenses by litigants who have slept upon their rights or prerogatives and, thus, have prejudiced opposing parties by or through their inexcusable delay." Letter from Alexander Hamilton, 15 F.4th at 526. It is "an equitable doctrine which penalizes a litigant for negligent or willful failure to assert [its] rights." Oriental Fin. Grp., Inc. v. Cooperativa De Ahorro Y Crédito Oriental, 698 F.3d 9, 20 (1st Cir. 2012) (ellipsis omitted) (quoting Valmor Prods. Co. v. Standard Prods. Corp., 464 F.2d 200, 204 (1st Cir. 1972)). Where, as here, a defendant raises laches as an affirmative defense to a claim brought within the statute of limitations, the defendant must show (1) that the plaintiff's delay in bringing its claim was unreasonable, and (2) that the delay resulted in prejudice to the defendant. K-Mart Corp. v. Oriental Plaza, Inc., 875 F.2d 907, 911 (1st Cir. 1989).

The complaint's allegations do not suggest that plaintiff delayed in bringing Count II, much less that any delay was unreasonable. As noted, plaintiff alleges it was notified of the Commissioner's intent to allocate LRGHealthcare's discharged bankruptcy debts to hospitals that were underpaid in DSH benefits in August 2023. Plaintiff brought this action within months of being so notified. Given the lack of any indication in the complaint that plaintiff unreasonably delayed bringing Count

II, the court does not find that the doctrine of laches provides grounds for dismissal of that count.

###### 4. Plaintiff Has a Private Right of Action to Enforce Sections (13)(A) and (2)(D)

The Commissioner next contends that Count II must be dismissed because there is no private right of action to enforce Sections (13)(A) and (2)(D). As noted, plaintiff brings its Medicaid Act claims under 42 U.S.C. § 1983. A cause of action exists under § 1983 for claims alleging violation of any "rights, privileges, or immunities secured by the Constitution and laws" of the United States. 42 U.S.C. § 1983. However, "[n]ot all violations of federal law give rise to § 1983 actions: 'the plaintiff must assert the violation of a federal right, not merely a violation of federal law.'" Rio Grande Cmty. Health Ctr., Inc. v. Rullan, 397 F.3d 56, 72 (1st Cir. 2005) (quoting Blessing v. Freestone, 520 U.S. 329, 340 (1997) (brackets omitted) (emphasis in Blessing)). Violation of a federal statute is actionable under § 1983 only if, by enacting the law, "Congress intended to create a federal right." Gonzaga Univ. v. Doe, 536 U.S. 273, 283 (2002) (emphasis omitted).

"For a statute to create such private rights, its text must be 'phrased in terms of the persons benefitted.'" Id. at 284 (quoting Cannon v. Univ. of Chicago, 441 U.S. 677, 692 n.13 (1979)); accord Alexander v. Sandoval, 532 U.S. 275, 288 (2001) (statute must contain "rights-creating language" (quotation omitted)); see, e.g., Cannon, 441 U.S. at 682 n.3, 690-93 & n.13 (reasoning that language of Title IX supported private right of action because statute's language focused on persons benefitted: "[n]o person . . . shall, on the basis of sex, . . . be subjected to

discrimination"). "Statutes that focus on the person regulated rather than the individuals protected create 'no implication of an intent to confer rights on a particular class of persons.'" Sandoval, 532 U.S. at 289 (quoting California v. Sierra Club, 451 U.S. 287, 294 (1981)). Nevertheless, "[l]anguage that directs state officials in the implementation of statutory objectives may still create an enforceable right where it 'mentions a specific, discrete beneficiary group within the statutory text' and 'speaks in individualistic terms, rather than at the level of institutional policy or practice.'" Colón-Marrero v. Vélez, 813 F.3d 1, 17-18 (1st Cir. 2016) (quoting Rio Grande, 397 F.3d at 74).

In addition to rights-creating language, the presence or absence of alternative means of enforcement bears on whether Congress intended to create a federal right. See Gonzaga, 536 U.S. at 289-90. Also relevant is whether "the right assertedly protected by the statute is . . . so 'vague and amorphous' that its enforcement would strain judicial competence," and whether the right is "couched in mandatory, rather than precatory, terms." Blessing, 520 U.S. at 340-41 (quoting Wright v. Roanoke Redev. & Hous. Auth., 479 U.S. 418, 431 (1987)).

The First Circuit has found certain provisions of the Medicaid Act enforceable under § 1983 post-Gonzaga. In Rio Grande, the First Circuit found that the requirement for "wraparound" payments for federally-qualified health centers contained in 42 U.S.C. § 1396a(bb) created a right which could be asserted in a § 1983 action. See Rio Grande, 397 F.3d at 72. The court found that the provision was "phrased in terms of the person benefitted" because it stated that state plans

must provide such payments "to the center." Rio Grande, 397 F.3d at 74 (quoting 42 U.S.C. § 1396a(bb)(5)(A)). Moreover, the statute spoke in mandatory rather than precatory terms: it said that states "shall" provide wraparound payments to federally-qualified health centers. Id. (quoting 42 U.S.C. § 1396a(bb)(5)(A)). Further supporting the existence of an enforceable right was the fact that the statute spoke "in individualistic terms, rather than at the aggregate level of institutional policy or practice." Id. "The mere fact that all Medicaid laws are embedded within the requirements for a state plan does not, by itself, make all of the Medicaid provisions into one stating a mere institutional policy or practice rather than creating an individual right." Id. Finally, the right to wraparound payments set forth in the statute was readily enforceable by the courts because it was "written in highly specific terms" that tell the state "exactly how to calculate the wraparound [payment] and it gives a maximum duration (4 months) between wraparound payments." Id. at 75.

    In Long Term Care (another post-Gonzaga case), the First Circuit strongly implied that Section (13)(A) creates rights enforceable under § 1983. Long Term Care involved Section (13)(A) as well as another Medicaid provision: 42 U.S.C. § 1396a(a)(30)(A) [hereinafter "Section (30)(A)"]. In that case, a group of pharmacies providing prescription drugs to nursing homes and similar institutions sued to enjoin Massachusetts from lowering reimbursement rates for the provision of pharmaceuticals. Long Term Care, 362 F.3d at 51-52. The pharmacies contended that the state's failure to provide them with a hearing before lowering rates violated

Section (13)(A), and that the proposed lowered rate violated Section (30)(A)'s requirement that rates be "sufficient to enlist enough providers to provide services similar to those generally available in the area." Id. at 52-53 (quoting 42 U.S.C. § 1396a(a)(30)(A)). However, the First Circuit did not reach an explicit conclusion as to whether Section (13)(A) conferred a right enforceable under § 1983 because the state conceded that a violation of Section (13)(A) was actionable for purposes of that case. See id. at 54. The court instead concluded that the plaintiffs had not stated a claim for violation of Section (13)(A) because the pharmacies were not providing services covered by the statute's notice-and-comment procedures. See 42 U.S.C. § 1396a(a)(13)(A) (public process requirements only apply to "rates of payment . . . for hospital services, nursing facility services, and services of intermediate care facilities for the mentally [disabled]"); Long Term Care, 362 F.3d at 55-56.

The court did find, however, that the plaintiffs had no private right of action to enforce Section (30)(A), and in so doing, the court contrasted Section (30)(A) with Section (13)(A). While the court explained that Section (13)(A) "has a narrow subject (rates for three specified rates of services) and confers procedural rights on designated persons or entities," Section (30)(A) "has much broader coverage, sets forth general objectives, and mentions no category of entity or person specially protected." Long Term Care, 362 F.3d at 56 (emphasis added). Section (30)(A), "unlike [Section] (13)(A), has no 'rights creating language' and identifies no discrete class of beneficiaries." Id. at 57 (quoting Gonzaga, 536 U.S. at 287-88). "[I]nstead," Section (30)(A) "focuses upon the state as 'the person regulated rather than

44

individuals protected.'" Id. (quoting Sandoval, 532 U.S. at 289). This court has previously relied on Long Term Care in ruling that Section (13)(A)'s public process requirements are enforceable in a private right of action. See Dartmouth-Hitchcock Clinic v. Toumpas, 856 F. Supp. 2d 315, 323-24 (D.N.H. 2012). The District of Maine has reached the same result, albeit before Long Term Care was decided (but after Gonzaga was). See Am. Soc'y of Consultant Pharmacists v. Concannon, 214 F. Supp. 2d 23, 28-29 (D. Me. 2002), abrogated on other grounds by Long Term Care, 362 F.3d at 59.

Outside the First Circuit, the Seventh Circuit has held that the public process requirements of Section (13)(A) are enforceable under § 1983. See BT Bourbonnais Care, LLC v. Norwood, 866 F.3d 815 (7th Cir. 2017). In Bourbonnais, several nursing homes sued the Illinois state agency responsible for administering Medicaid funds for failing to comply with the state's own payment methodologies, arguing that deviating from the state's duly promulgated payment methodologies violated Section (13)(A)'s public process requirements. See 866 F.3d at 817-18. The Seventh Circuit held that Section (13)(A) conferred enforceable rights upon the plaintiffs because the statute stated that plaintiffs "'must' be given an opportunity to review and comment on the proposed reimbursement rates" and "it identifies providers [such as the plaintiffs] as the beneficiaries of the federal law," given their clear interest in the process by which the state sets Medicaid payment rates. Id. at 821. Moreover, the right conferred by Section (13)(A) was not vague or amorphous. Rather, the statute "spells out exactly what the procedural requirements are for the

45

process of rate-setting: publication of the proposed rates, methodologies used, and justifications; reasonable opportunity to comment; and publication of the final rates, methodologies, and justifications." Id. at 821-22. Nor did Section (13)(A) "leave any room for discretion on the part of the state" given its unambiguous language that state plans "'must' provide the public process described in the law." Id. at 822.

In light of the foregoing authorities, the court finds that plaintiff may sue for alleged violations of Sections (13)(A) and (2)(D) under § 1983. As the First Circuit explained in Long Term Care, Section (13)(A) "confers procedural rights" on a "discrete class of beneficiaries—two touchstones in Gonzaga's analysis."[7] 362 F.3d at 56-57. The state plan "must" give "providers" of specified services "a reasonable opportunity for review and comment on" the state's "proposed [payment] rates, methodologies, and justifications." 42 U.S.C. § 1396a(a)(13)(A). The state plan "must" also provide for a process by which providers are notified of proposed and final payment rates, along with the methodologies and justifications behind those rates. Id. Thus, although Section (13)(A) "directs state officials in the

---

[7] The Commissioner characterizes the First Circuit's analysis of Section (13)(A) in Long Term Care as dicta because the First Circuit did not expressly hold that § 1983 supplies a cause of action to enforce Section (13)(A). The court does not agree. The First Circuit's characterization of Section (13)(A) was necessary to its holding that Section (30)(A) did not confer procedural rights capable of enforcement under § 1983. See Long Term Care, 362 F.3d at 57 (reasoning that there was no private right of action to enforce Section (30)(A) in part because, "unlike [Section] (13)(A), [it] has no rights creating language and identifies no discrete class of beneficiaries" (quotation omitted)). Because the First Circuit's analysis of Section (13)(A) was necessary to its holding, it is not dicta. See, e.g., Arcam Pharm. Corp. v. Faría, 513 F.3d 1, 3 (1st Cir. 2007) ("[W]hen a statement in a judicial decision is essential to the result reached in the case, it becomes part of the court's holding." (quoting Rossiter v. Potter, 357 F.3d 26, 31 (1st Cir. 2004))).

implementation of statutory objectives," (by specifying the public process that the state must engage in), it nevertheless contains rights-creating language because the statutory objective which the officials must carry out is to comply with individual rights the statute confers upon a discrete group of beneficiaries. Colón-Marrero, 813 F.3d at 17-18.

Moreover, the rights secured by Sections (13)(A) and (2)(D) are readily susceptible to judicial enforcement—i.e., they are not "vague and amorphous." Blessing, 520 U.S. at 340 (quotation omitted). The procedural requirements set forth in Sections (13)(A) and (2)(D) are "garden-variety procedural rules" to notice and comment, procedural rights "which courts are very good at enforcing." Bourbonnais, 866 F.3d at 822. Nor do these sections speak in precatory terms. State plans "must" provide the public process set forth in those statutes. See id. Such mandatory obligations are akin to the clear prohibitions on discrimination contained in Titles VI and IX, which the Gonzaga court pointed to as the exemplars of mandatory language suggesting conferral of an enforceable right. See Gonzaga, 536 U.S. at 284 & n.3; see also Bourbonnais, 866 F.3d at 822 (finding it "difficult, if not impossible, as a linguistic matter, to distinguish the import of the relevant Medicaid Act language—'A State Plan must provide'—from the 'no person shall' language of Titles VI . . . and IX" (brackets omitted) (quoting S.D. ex rel. Dickson v. Hood, 391 F.3d 581, 603 (5th Cir. 2004))).

The Commissioner contends that Section (13)(A) is not enforceable in a private right of action because the statute in which that section appears "is phrased

as a directive to the federal agency charged with approving state Medicaid plans, not as a conferral of the right to sue upon the beneficiaries of the State's decision to participate in Medicaid." Doc. no. 19-1 at 25 (quoting Armstrong v. Exceptional Child Ctr., Inc., 575 U.S. 320, 331 (2015) (plurality opinion)). True, another provision of § 1396a, the statute in which Section (13)(A) appears, states that the federal government "shall approve any plan which fulfills the conditions specified in" Section (13)(A), among other sections of the statute. 42 U.S.C. § 1396a(b). But plaintiff's Medicaid Act claims are not premised upon a violation of this provision; they allege only violations of Sections (13)(A) and (2)(D). "The Supreme Court has made clear that generalized language in some sections of a statute is not a barrier to a private right of action under another section of the same statute." Colón-Marrero, 813 F.3d at 16 (citing Blessing, 520 U.S. at 344-46, and Sandoval, 532 U.S. at 288-89); see also Bourbonnais, 866 F.3d at 823 (explaining that "[e]ach part of the statute must be evaluated on its own"). Thus, the question before this court "is whether the specific provision[s] on which" plaintiff relies "create a private right." Colón-Marrero, 813 F.3d at 17. The Commissioner's argument as to whether citizens may have a private right of action to enforce other provisions of the statute is therefore not persuasive.

The Commissioner also argues that there is no private right of action here because the Medicaid Act contains an alternative enforcement mechanism, namely, the withholding of federal funds. However, this enforcement mechanism exists in every piece of Spending Clause legislation, and the caselaw has never gone so far as

to suggest that Spending Clause legislation cannot support an action under § 1983.

See Bourbonnais, 866 F.3d at 820-21 (finding "nothing in Armstrong, Gonzaga, or any other case [to] support[ ] the idea that plaintiffs are now flatly forbidden in section 1983 actions to rely on a statute passed pursuant to Congress's Spending Clause powers"). The Commissioner points to the Supreme Court's opinion in Armstrong, where the Supreme Court found that the possibility of funding withdrawal when combined with the lack of rights-creating language in Section (30)(A) as well as the "judicially unadministrable nature" of the provision's requirements foreclosed private rights of action. 575 U.S. at 328-29, 331-32. Here, by contrast, Sections (13)(A) and (2)(D) contain rights-creating language and are easily administered by courts. "The fact that the Federal Government can exercise oversight of a federal spending program and even withhold or withdraw funds . . . does not demonstrate that Congress has 'displayed an intent not to provide the more complete and more immediate relief that would otherwise be available" in a private right of action. Va. Off. for Prot. & Advoc. v. Stewart, 563 U.S. 247, 256 n.3 (2011) (quoting Verizon, 535 U.S. at 647). Indeed, if the possibility of funding withdrawal sufficed to eliminate private rights of actions to enforce Spending Clause legislation, "there would have been no need [in Gonzaga] to send lower courts off on a search for 'unambiguously conferred rights'" when considering whether Spending Clause legislation is privately enforceable. Bourbonnais, 866 F.3d at 821.

The Commissioner points to cases in which courts have found that Sections
(13)(A) or (2)(D) were not enforceable in a private right of action. None is
persuasive. In New York Association of Homes and Services for the Aging, Inc. v.
DeBuono, 444 F.3d 147 (2d Cir. 2006), the Second Circuit summarily affirmed a
district court order concluding that Section (13)(A) did not confer any substantive
enforceable rights to "reasonable and adequate" Medicaid payments.[8] Here, Count
II does not allege that plaintiff has any substantive right to a particular DSH
payment, but rather that the Commissioner failed to go through the statutorily
required public process in altering its methodology for distributing DSH payments
when overall DSH funding is reduced as a result of one disproportionate share
hospital's bankruptcy. As discussed, Sections (13)(A) and (2)(D) confer a procedural
right to notice of and comment upon a state's DSH payment methodology.

Other cases cited by the Commissioner suffer from the same issue. See
Child.'s Seashore House v. Waldman, 197 F.3d 654, 659 (3d Cir.1999) ("[B]y
replacing the Boren Amendment with a requirement that a state establish a public
process by which its rates would be determined, Congress has removed a party's

---

[8] Section (13)(A) previously contained a provision known as the "Boren
Amendment," which required state plans to provide for "reasonable and adequate"
DSH payments. Long Term Care, 362 F.3d at 58. Congress repealed the Boren
Amendment in 1997. Id. Prior to the Boren Amendment's repeal, the Supreme Court
had held that Medicaid providers had a cause of action "to have the State adopt rates
that it finds are reasonable and adequate rates to meet the costs of an efficient and
economical health care provider." Wilder, 496 U.S. at 524. The Boren Amendment's
repeal, however, resulted in the Second Circuit's affirmance of the district court's
order finding that Section (13)(A) no longer conferred an enforceable right to a
substantively reasonable rate. See In re NYAHSA Litig., 318 F. Supp. 2d 30, 38-39
(N.D.N.Y. 2004).

ability to enforce any <u>substantive</u> right." (emphasis added)); <u>id.</u> at 660 (concluding

similarly that Section (2)(D) did not allow plaintiff "to press its claims" that it had a

substantive right to DSH payments); <u>Springfield Hosp. v. Hoffman</u>, No. 09-cv-254-

cr, 2010 WL 3322716, at *9-11 (D. Vt. Apr. 9, 2010) (applying Second Circuit's

opinion in <u>DeBuono</u>). More importantly, to the extent the cases cited by the

Commissioner even support her position, those cases are inconsistent with the First

Circuit's holding in <u>Long Term Care</u>, which this court is not free to disregard (and

would not disregard even if <u>Long Term Care</u>'s analysis of Section (13)(A) were dicta,

which it is not).

　　　Finally, the Commissioner contends that Plaintiff lacks a cause of action

because, as a matter of statutory interpretation, Section (13)(A)'s public process

requirements do not apply to DSH payment methodology. The Commissioner is

incorrect.

　　　Under Section (13)(A), a state plan must provide:

> for a public process for determination of rates of payment
> under the plan for hospital services, nursing facility
> services, and services of intermediate care facilities for the
> mentally retarded under which—
>
> > (i) proposed rates, the methodologies underlying the
> > establishment of such rates, and justifications for
> > the proposed rates are published,
> >
> > (ii) providers, beneficiaries and their
> > representatives, and other concerned State
> > residents are given a reasonable opportunity for
> > review and comment on the proposed rates,
> > methodologies, and justifications,

(iii) final rates, the methodologies underlying the establishment of such rates, and justifications for such final rates are published, and

(iv) in the case of hospitals, such rates take into account (in a manner consistent with [Section (2)(D)]), the situation of hospitals which serve a disproportionate number of low-income people with special needs.

42 U.S.C. § 1396a(a)(13)(A). Section (2)(D) provides:

A State plan under this subchapter shall not be considered to meet the requirements of [Section (13)(A)(iv)] (insofar as it requires payments to hospitals to take into account the situation of hospitals that serve a disproportionate number of low-income patients with special needs) . . . unless the State has submitted to the Secretary . . . a description of the methodology used by the State to identify and to make payments to disproportionate share hospitals . . . .

42 U.S.C. § 1396r-4(a)(2)(D).

The Commissioner argues that the public process requirements set forth in Section (13)(A)(i) through (iii) do not apply to DSH payment methodology. However, Section (13)(A), in which subsection (iv) appears, requires a state plan to provide "for a public process for determining rates of payment under the plan for hospital services." 42 U.S.C. § 1396a(a)(13)(A). Subsection (iv) provides that "such rates," i.e., the proposed and final payment rates that must undergo the notice-and-comment process set forth in Section (13)(A), must "take into account . . . the situation of" disproportionate share hospitals. § 1396a(a)(13)(A)(iv). The manner in which those payment rates take disproportionate share hospitals into account must be "consistent" with Section (2)(D). Id. Section (2)(D) in turn provides that a state plan "shall not be considered to meet the requirements of [Section (13)(A)(iv)]

. . . unless the State has submitted a description" of its DSH payment methodology. § 1396r-4(a)(2)(D). In other words, Section (2)(D) injects into Section (13)(A)(iv) a requirement that, in setting hospital payment rates pursuant to the statutorily required public process, the state must establish a methodology for making DSH payments.[9] The court therefore rejects the Commissioner's argument that a state's DSH payment methodology falls outside Section (13)(A).

C.    <u>Summary</u>

The court's conclusions as to plaintiff's Medicaid Act claims (Counts I and II) are as follows. Count I fails to state a claim upon which relief can be granted because Sections (13)(A) and (2)(D) impose procedural—not substantive—requirements on state's DSH payment methodologies. Those statutes do not require, as plaintiff urges, that state plans provide for a certain degree of specificity in how the state determines uncompensated care costs or in making DSH payments. Count II, by contrast, states a claim because the Commissioner's methodology for allocating LRGHealthcare's discharged overpayments did not go through the public process required by those statutes. Plaintiff has standing to pursue the claim alleged in Count II, and that claim is neither untimely nor barred by laches. Finally, plaintiff has a private right of action to enforce the public process requirements of Sections (13)(A) and (2)(D).

---

[9] It is noteworthy that the Commissioner's co-defendants—the Federal Defendants—agree with plaintiff and the court that DSH payment methodologies are subject to Section (13)(A)'s public process requirements. <u>See</u> doc. no. 44-1 at 11.

For these reasons, the court grants the Commissioner's motion to dismiss as to Count I but denies it as to Count II.

IV.   Due Process Claims

The court next addresses the Commissioner's arguments for dismissal of plaintiff's due process claims—Counts III and IV. The Commissioner argues that neither Count III nor Count IV states a claim upon which relief may be granted. To state a procedural due process claim, the plaintiff must plausibly allege facts that would show that (1) the plaintiff has been deprived of a protected interest by the state (2) without sufficient procedural protections. Reed, 598 U.S. at 236. In Count III, plaintiff alleges that recoupment of plaintiff's overpayments in interim DSH benefits would violate procedural due process. In Count IV (brought in the alternative to Count III), plaintiff alleges that the Commissioner's planned allocation of LRGHealthcare's DSH overpayments violates plaintiff's procedural due process rights because it will deprive plaintiff of a DSH payment it is entitled to without adequate process.

A.   Count III Fails to State a Claim Because Plaintiff Does Not Plausibly Allege the Deprivation of a Protected Property Interest

"The procedural component of the Due Process Clause does not protect everything that might be described as a 'benefit': 'To have a property interest in a benefit, a person must have more than an abstract need or desire' and 'more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it.'" Town of Castle Rock v. Gonzales, 545 U.S. 748, 756 (2005) (quoting Bd. of

Regent of State Colls. v. Roth, 408 U.S. 564, 577 (1972)). "Such entitlements are, 'of course, . . . not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law.'" Id. (quoting Paul v. Davis, 424 U.S. 693, 709 (1976)).

A benefit is not a protected property interest "if government officials may grant or deny it in their discretion." Id. The more the government's discretion to grant or deny a benefit is circumscribed, the more likely the benefit is to be a protected property interest. Clukey v. Town of Camden, 717 F.3d 52, 56 (1st Cir. 2013). The types of entitlements that may give rise to a protected property interest are varied. See, e.g., Lowe v. Scott, 959 F.2d 323, 339 (1st Cir. 1992) (holding that physician had a property interest in hospital privilege to supervise nurse midwives). Regardless of the precise nature of the interest, a "protected property interest exists where substantive criteria clearly limit discretion 'such that the plaintiff cannot be denied the interest unless specific conditions are met.'" Rock River Health Care, LLC v. Eagleson, 14 F.4th 768, 773-74 (7th Cir. 2021) (quoting Bell v. City of Country Club Hills, 841 F.3d 713, 719 (7th Cir. 2016)).

In Count III, plaintiff alleges that it has a protected property interest "in having DSH payments calculated in accordance with the statutorily defined process." Doc. no. 1 ¶ 104. In other words, plaintiff contends that it has a protected property interest in having its DSH payments calculated in the manner required by the Medicaid Act. Plaintiff doubles down on this position in its objection to the

Commissioner's motion to dismiss, asserting that "federal law places substantive limits on the state when it comes to distributing DSH payments to hospitals." Doc. no. 34-1 at 36.

The property interest plaintiff alleges is materially identical to the Medicaid Act claim in Count I. Essentially, plaintiff claims that the Medicaid Act confers an entitlement to a certain degree of specificity in the state's publicly-promulgated DSH payment methodology, and that the descriptions of the methodology set forth in the relevant versions of the state plan deprives plaintiff of this interest because they do not adequately describe how the state will ascertain hospitals' uncompensated care costs. However, as discussed above in considering whether Count I stated a claim upon which relief could be granted, the Medicaid statutes plaintiff relies upon do not impose any substantive criteria against which the specificity of the state's methodology for calculating DSH payments or uncompensated care costs may be judged. They merely require that a state go through a public process in promulgating whatever DSH payment system the state elects to adopt. It is undisputed in this case that New Hampshire's state plan was promulgated in compliance with Section (13)(A)'s requirements.

Plaintiff cites the Seventh Circuit's opinion in <u>Rock River</u> in support of its position, but that case is inapposite. In <u>Rock River</u>, three long-term nursing care facilities sued the state of Illinois, arguing that the state violated their procedural due process rights by retroactively recalculating the plaintiffs' Medicaid reimbursement rates. 14 F.4th at 770-71. The plaintiffs alleged that the state failed

to follow the procedures set forth under <u>state</u> law regarding how such reimbursement rates may be recalculated. <u>Id.</u> at 772. Because Illinois state law "strictly circumscribed" the procedures by which the state could retroactively adjust reimbursement rates, the Seventh Circuit held that an alleged failure to abide by those procedures stated a procedural due process claim. <u>Id.</u> at 774-76; <u>see</u> <u>id.</u> at 771-72 (explaining the rate calculation procedure mandated by state law). Here, by contrast, the Medicaid Act provisions plaintiff relies upon do not require states to use any particular DSH payment methodology—they require states to follow a public process in deciding what DSH payment methodology they will use. Because the Commissioner adhered to a public process in implementing a DSH payment methodology requiring that interim DSH payments be reconciled in subsequent fiscal years to account for variations between projected uncompensated care costs and actual uncompensated care costs, Count III fails to plausibly allege the deprivation of a protected property interest, and accordingly fails to state a claim upon which relief may be granted.[10]

### B.    The Commissioner Has Not Shown That Count IV Should Be Dismissed

In Count IV, plaintiff alleges that it has a protected property interest in its 2017 DSH payment. Doc. no. 1 ¶ 116 (alleging that the Commissioner's "planned reallocation to other hospitals of the bankrupt hospitals' alleged DSH overpayments violates procedural due process because it will deprive [plaintiff] of a DSH

---

[10] In light of this conclusion, the court need not address the Commissioner's argument that Count III is barred the statute of limitations or laches.

underpayment it is owed without adequate pre- or post-deprivation procedures"). The Commissioner does not dispute that plaintiff has a property interest in its 2017 DSH payment. The Commissioner argues, similar to her standing argument as to Count II, that Count IV fails to allege that plaintiff will be deprived of this interest because "[p]laintiff alleges no facts demonstrating that the reduction to its final DSH payment for 2017 exceeds the sum of any increase to its final DSH payment adjustments for 2011, 2014, 2015, and 2016 resulting from the methodology change." Doc. no. 19-1 at 38. The Commissioner does not explain why plaintiff needed to allege such facts in order to plausibly allege that the Commissioner's planned actions would deprive plaintiff of its 2017 DSH payment without adequate process, and the court is unaware of any authority that would impose such a requirement on plaintiff. To the extent the Commissioner intended to argue that plaintiff lacks standing as to Count IV, that argument fails for the same reason it failed as to Count II. Therefore, the Commissioner has failed to show that Count IV should be dismissed.[11]

---

[11] In its reply to plaintiff's objection to the motion to dismiss, the Commissioner asserts for the first time that Count IV fails to state a claim because plaintiff does not plausibly allege a risk of erroneous deprivation of its 2017 DSH payment in the absence of additional procedural protections. This argument is waived because it was raised for the first time in a reply brief. See Frese v. MacDonald, 512 F. Supp. 3d 273, 290 (D.N.H. 2021). Even if it was not waived, the court would find it insufficiently developed. See Debaker v. Comm'r of U.S. Soc. Sec. Admin., Civ. No. 19-cv-107-JL, 2019 WL 4027542, at *2 (D.N.H. Aug. 27, 2019).

The Commissioner also argued that Count IV was untimely and barred by the doctrine of laches. The court rejects those arguments for the same reasons it rejected them as to Count II.

V.      A Preliminary Injunction Will Issue to Preserve the Status Quo

The court next turns to plaintiff's motion for a preliminary injunction.

Plaintiff seeks a preliminary injunction that would enjoin the Commissioner in two

respects. See doc. no. 2 at 2 (prayer for relief). First, plaintiff seeks to enjoin the

Commissioner from clawing back plaintiff's DSH overpayments. Second, plaintiff

seeks to enjoin the Commissioner from reallocating LRGHealthcare's alleged

overpayments to plaintiff. Ostensibly, the first form of relief plaintiff seeks relates

to Counts I and III, as those are the counts that challenge the legality of the

Commissioner's attempts to recoup plaintiff's DSH payments. By the same token,

the second form of relief plaintiff seeks relates to Counts II and IV, which challenge

the lawfulness of the Commissioner's attempts to force hospitals that were

underpaid in DSH benefits in a given fiscal year to bear the cost of the state's

inability to recover overpayments to LRGHealthcare in said year.

"The purpose of a preliminary injunction is to preserve the status quo,

freezing an existing situation so as to permit the . . . court, upon full adjudication of

the case's merits, [to] more effectively remedy discerned wrongs." CMM Cable Rep.,

Inc. v. Ocean Coast Props., Inc., 48 F.3d 618, 620 (1st Cir. 1995). As noted, to obtain

a preliminary injunction, the movant must show: (1) a likelihood of success on the

merits; (2) that it would be irreparably injured in the absence of a preliminary

injunction; (3) that the balance of equities tips in its favor; and (4) that the

injunction is in the public interest. Thomas, 596 F. Supp. 3d at 336. The first two

factors—irreparable harm and likelihood of success on the merits—are the most

important. Id. These two factors are viewed in tandem, such that a strong showing

of irreparable harm can excuse a comparatively weaker showing of likelihood of success on the merits. Bos. Taxi Owners, 180 F. Supp. 3d at 127. Where the potential for irreparable harm is high, a preliminary injunction may issue if the plaintiffs' claims present "fair grounds for further litigation." Patch, 167 F.3d at 26-27.

Plaintiff makes a strong showing of irreparable harm. The Commissioner has demanded that plaintiff return millions of dollars in DSH funds, and has declined to award plaintiff a DSH payment of nearly $300,000 for 2017, which plaintiff would otherwise be owed but for the Commissioner's plan to allocate LRGHealthcare's 2017 overpayment to disproportionate share hospitals that were underpaid in that year. While monetary harms are considered reparable in most instances, "if a movant seeking a preliminary injunction will be unable to sue to recover any monetary damages against a government agency in the future . . . financial loss can constitute irreparable injury." Tex. Child.'s Hosp. v. Burwell, 76 F. Supp. 3d 224, 242 (D.D.C. 2014) (quoting Nat'l Mining Ass'n v. Jackson, 768 F. Supp. 2d 34, 52 (D.D.C. 2011)). Here, plaintiff would be unable to recover any DSH payments returned to or retained by the state if the court does not issue injunctive relief. The state plan provides no mechanism for recovering recouped or retained DSH payments, and the Commissioner intends to redistribute any funds clawed back from plaintiff to other disproportionate share hospitals. See N.H. Hosp. Ass'n I, 2016 WL 1048023, at *18 (finding harm posed by recoupment of DSH funds to be irreparable because "New Hampshire does not have a procedure for recovering DSH

funds once they have been recouped"). Moreover, sovereign immunity would bar plaintiff from obtaining a damages award of any recouped or retained DSH funds. E.g., Edelman, 415 U.S. at 663. "Where a plaintiff stands to suffer a substantial injury that cannot adequately be compensated by an end-of-case award of money damages, irreparable harm exists." Rosario-Urdaz v. Rivera-Hernandez, 350 F.3d 219, 222 (1st Cir. 2003). In short, in the absence of preliminary relief, plaintiff will be forced to forfeit millions of dollars with no adequate remedy at law. "Similarly unrecoverable economic loss has been found to be 'more than sufficient, especially when considered with the other preliminary-injunction factors, to justify a preliminary injunction.'" Tex. Child.'s Hosp., 76 F. Supp. 3d at 242 (brackets omitted) (quoting Brendsel v. Off. of Fed. Hous. Enter. Oversight, 339 F. Supp. 2d 52, 67 (D.D.C. 2004)).

Plaintiff has also established a strong likelihood that it will ultimately prevail on Counts II and IV. Except in one respect, the parties' arguments regarding plaintiff's likelihood of success on these counts mirror their arguments for and against dismissal of these counts.[12] Plaintiff is likely to prevail on the merits as to

---

[12] The Commissioner contends that plaintiff is unlikely to succeed on the merits of Counts II and IV because plaintiff is equitably estopped from challenging any change in the state plan methodology relative to treatment of the bankrupt hospitals' DSH overpayments, insofar as any change was requested by the Hospital Association, which the Commissioner contends was acting as plaintiff's agent. See generally Mimiya Hosp. Inc. SNF v. U.S. Dep't of Health & Hum. Servs., 331 F.3d 178, 182 (1st Cir. 2003); Planet Fitness Int'l Franchise v. JEG-United, LLC, 561 F. Supp. 3d 9, 14 (D.N.H. 2021). However, the testimony at the evidentiary hearing on the preliminary injunction motion established that the Hospital Association did not have actual or apparent authority to request any change relative to the treatment of

Count II because the state plan in effect for 2017 does not provide a mechanism by which the state can force hospitals that were underpaid in DSH benefits in that year to absorb the funding shortfall occasioned by the state's inability to recoup DSH overpayments made to bankrupt hospitals. By implementing a plan to do just that without complying with the public process requirements of Sections (13)(A) and (2)(D), the Commissioner violates those provisions of the Medicaid Act. Similarly, plaintiff is likely to prevail on the merits as to Count IV. It is undisputed that, under the version of the state plan for 2017 that underwent the Medicaid Act's public process requirements, plaintiff is entitled to a DSH payment. Implementation of the Commissioner's plan to deviate from the 2017 state plan— which did not undergo notice and comment, and which the Commissioner has not afforded plaintiff a meaningful opportunity to challenge—would deprive plaintiff of that payment. See, e.g., Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 542 (1985).

As for Counts I and III, while the court has found those counts should be dismissed, the legal viability of those counts present questions of first impression. The parties have not cited to any cases in which courts have grappled with whether Sections (13)(A) and (2)(D) impose substantive requirements on state plans to define how the state will calculate DSH payments with a particular degree of specificity,

---

bankrupt hospitals' overpayments on plaintiff's behalf. Henry Lipman, the Medicaid Director at the New Hampshire Department of Health and Human Services, testified that he was aware that plaintiff was not bound by any request the Hospital Association made and that plaintiff objected to the Hospital Association's requested approach for handling the bankrupt hospitals' DSH overpayments.

and this court is not aware of any such guidance in the case law. The Supreme Court has lamented the Medicaid Act's "Byzantine construction," making the Act "almost unintelligible to the uninitiated." Schweiker v. Gray Panthers, 453 U.S. 34, 43 (1981) (quoting Friedman v. Berger, 547 F.2d 724, 727 n.7 (2d Cir. 1976) (Friendly, J.)). Here, while the court has determined that Counts I and III fail to state a claim based on the court's interpretation of the relevant provisions of the Medicaid Act, the complexity of these issues of first impression suggests that reasonable judicial minds could reach a different conclusion. In other words, the legal viability of Counts I and III presents "fair grounds for further litigation." Patch, 167 F.3d at 26. At the same time, it is a virtual certainty that plaintiff would be irreparably and substantially harmed absent a preliminary injunction. Plaintiff would be forced to forfeit over $8 million in DSH payments with no ability to recover those funds. Considered against plaintiff's strong showing of irreparable harm if the court does not grant the requested preliminary injunction, plaintiff has sufficiently demonstrated a likelihood of success on the merits as to Counts I and III. See id.

The balance of equities and the public interest weigh in favor a preliminary injunction. See Does 1-6 v. Mills, 16 F.4th 20, 37 (1st Cir. 2021) (explaining that the third and fourth preliminary injunction factors "merge when the government is the opposing party" (brackets omitted) (quoting Nken v. Holder, 556 U.S. 418, 435 (2009))). Disproportionate share hospitals, such as plaintiff, are already not fully reimbursed for all of the uncompensated care they provide. See N.H. Hosp. Ass'n I, 2016 WL 1048023 at *19. DSH funds are necessary to ensure that such hospitals

63

can provide low-income, elderly, and disabled citizens with needed medical care. Absent an injunction, plaintiff would be forced to remit approximately $8 million— the loss of such a substantial amount could have negative impacts on plaintiff's operation, and may cause plaintiff to cut programs and services for Medicaid patients. See id. at *18. As for the Commissioner, the requested injunction would simply preserve the status quo while this litigation plays out; if the Commissioner is ultimately successful, she will be able to recover any overpayments from plaintiff. "It is thus not the case that the alleged irreparable economic injury suffered by [plaintiff] would be offset by the corresponding economic injury to [the Commissioner]." Tex. Child.'s Hosp., 76 F. Supp. 3d at 246 (quotation omitted).

Finally, although Federal Rule of Civil Procedure 65 ordinarily requires parties obtaining injunctive relief to post bond, here the court concludes that no bond is required. "First, and perhaps most importantly, [the Commissioner] ha[s] not asked that plaintiff[ ] post a bond." N.H. Hosp. Ass'n I, 2016 WL 1048023, at *19 (citing Aoude v. Mobil Oil Corp., 862 F.2d 890, 896 (1st Cir. 1988)). Moreover, while Rule 65 "speaks in mandatory terms, an exception for the bond requirement has been crafted for, inter alia, cases involving the enforcement of public interests arising out of comprehensive federal health and welfare statutes." Dartmouth-Hitchcock Clinic v. Toumpas, No. 11-cv-358-SM, 2012 WL 748575, at *1 (D.N.H. Mar. 2, 2012) (quoting Pharm. Soc'y v. N.Y. State Dep't of Soc. Servs., 50 F.3d 1168, 1174 (2d Cir. 1995)).

## CONCLUSION

The Commissioner's motion to dismiss (doc. no. 19) is granted as to Counts I and III but denied as to Counts II and IV.

Plaintiff's motion for a preliminary injunction (doc. no. 2) is granted as follows:

1.  The Commissioner of the New Hampshire Department of Health and Human Services is hereby enjoined from recouping alleged DSH overpayments from plaintiff pending the resolution of this action on the merits.

2.  The Commissioner of the New Hampshire Department of Health and Human Services is hereby enjoined from reallocating to plaintiff LRGHealthcare's DSH overpayments for fiscal year 2017 pending the resolution of this action on the merits.

    SO ORDERED.

_____
Landya McCafferty
United States District Judge

August 5, 2024

cc:     Counsel of Record